Vitaform, Inc. v. Aeroflow, Inc., 2022 NCBC 65.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 3707

VITAFORM, INC. d/b/a BODY
AFTER BABY,

        Plaintiff,

v.

AEROFLOW, INC. and MOTIF
MEDICAL, LLC,

        Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

1.    **THIS MATTER** is before the Court upon Defendants Aeroflow, Inc. ("Aeroflow") and Motif Medical, LLC's ("Motif") (together, the "Defendants") Motion for Summary Judgment (the "Motion") pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Rule(s)") in the above-captioned case. (ECF No. 122.)

2.    Having considered the Motion, the briefs, exhibits, and affidavits in support of and in opposition to the Motion, the arguments of counsel at the hearing on the Motion, and other appropriate matters of the record, the Court **GRANTS in part** and **DENIES in part** the Motion for the reasons set forth below.

> *Smith DeVoss, PLLC, by Jeffrey J. Smith and John R. DeVoss, and Wimer & Snider, P.C., by Jake A. Snider, for Plaintiff Vitaform, Inc. d/b/a Body After Baby.*
>
> *Ward and Smith, P.A., by Joseph A. Schouten, Hayley R. Wells, and Jordan M. Spanner, for Defendants Aeroflow, Inc. and Motif Medical, LLC.*

Bledsoe, Chief Judge.

## FACTUAL AND PROCEDURAL BACKGROUND

3. "[I]in ruling on a motion for summary judgment[,] the trial judge does not make findings of fact, which are decisions upon conflicting evidence, but [the judge] may properly list the uncontroverted material facts which are the basis of [the judge's] conclusions of law and judgment." *Rodgerson v. Davis*, 27 N.C. App. 173, 178 (1975).

4. Plaintiff Vitaform, Inc. d/b/a Body After Baby ("BAB") is a California corporation that is wholly owned by Don Francisco ("Francisco"), its president and founder.[1] Francisco formed BAB "to target the maternity band market and to develop the market for post-partum compression garments."[2] Based on his experience in the durable medical equipment ("DME") industry, Francisco saw an opportunity to market "maternity compression wear that would include the application of an insurance payment model."[3]

5. After consulting with medical professionals, Francisco designed and developed a pre-birth maternity band, the "Motherload," and two compression garments for post-partum recovery, the "Angelica" and the "Sienna" (collectively, the

---

[1] (*See* First Am. Compl. ¶ 1 [hereinafter "FAC"], ECF No. 40; Defs.' Mem. Law Supp. Mot. Summ. J. Ex. A Dep. Donald H. Francisco, dated May 12, 2021, at 30:10–12, 46:17–19 [hereinafter "Francisco Dep."], ECF No. 123.2.)

[2] (Pl.'s Resp. Br. Defs.' Mot. Summ. J. Ex. C Aff. Don Francisco, dated Sept. 30, 2019, at ¶ 2 [hereinafter "2d Francisco Aff."], ECF No. 126.4.)

[3] (Pl.'s Resp. Br. Defs.' Mot. Summ. J. Ex. B Aff. Don Francisco, dated Sept. 30, 2019, at ¶¶ 7, 9 [hereinafter "1st Francisco Aff."], ECF No. 126.3.)

"Maternity Compression Garments"), which were designed to address specific medical conditions associated with pregnancy.[4] According to Francisco, the Angelica and Sienna were the first compression garments designed specifically for post-partum recovery,[5] and the Maternity Compression Garments were the first such products that qualified for insurance reimbursement.[6]

6.     BAB began selling its Maternity Compression Garments sometime between 2012 and 2013, directly through its own website as well as through various regional DME providers.[7] In 2017, BAB began to sell its products through 1 Natural Way ("1NW"), a regional DME subcontractor for Aeroflow.[8] BAB provided "[a]ll of [its] white papers, all of [its] marketing efforts, all of [its] years of understanding the products, the sizing, [and] how insurance correlates[ ]" to 1NW, recognizing the need to "shar[e] that process and product with someone that is in a position to put it into the market."[9]

---

[4] (*See* 2d Francisco Aff. ¶ 3; Francisco Dep. 48:15–21, 56:9–18; *see generally* Pl.'s Resp. Br. Defs.' Mot. Summ. J. Ex. P, ECF No. 126.18 (under seal).)

[5] (*See* 1st Francisco Aff. ¶ 4; Pl.'s Resp. Br. Defs.' Mot. Summ. J. Ex. D Aff. Don Francisco, dated Sept. 30, 2019, at ¶¶ 1, 17 [hereinafter "3d Francisco Aff."], ECF No. 126.5.)

[6] (*See* Francisco Dep. 84:3–11, 91:16–92:1, 118:13–19; 2d Francisco Aff. ¶¶ 4, 7, 9.)

[7] (*See* Francisco Dep. 43:12–22, 44:1–24, 84:16–85:4.)

[8] (*See* Francisco Dep. 105:16–22, 108:18–21; 3d Francisco Aff. ¶ 3; Defs.' Mem. Law Supp. Mot. Summ. J. Ex. B Aff. Ryan D. Wright, dated Aug. 4, 2021, at ¶ 9 [hereinafter "Wright Aff."], ECF No. 123.3.)

[9] (Francisco Dep. 113:11–15; *see also* Francisco Dep. 121:21–23:27, 126:19–28:17, 132:21–24.)

7.     BAB's work with 1NW "proved to be extremely successful on a regional basis,"[10] and Francisco determined that it was time to "connect[ ] with a DME provider with national reach[.]"[11] According to Francisco, he had "been attempting to break through with someone at Aeroflow,"[12] a nationwide DME provider and distributor offering multiple brands from multiple manufacturers,[13] when Evan Israel ("Israel"), Aeroflow's director of emerging markets, contacted him on 19 July 2018 (the "July 19 Call") after receiving Francisco's contact information from 1NW.[14]

8.     During the July 19 Call, Francisco pitched BAB and its products to Israel, explaining that he had designed the Maternity Compression Garments to qualify for health insurance coverage as DME.[15] Francisco claims that he and Israel came to an oral agreement during the July 19 Call whereby BAB would provide Aeroflow with its products, marketing material, and insurance coding information and, in exchange, Aeroflow would market the Maternity Compression Garments through its national distribution channels, process the associated insurance claims, and pay BAB for

---

[10] (3d Francisco Aff. ¶ 3.)

[11] (3d Francisco Aff. ¶ 6.)

[12] (3d Francisco Aff. ¶ 4.)

[13] (*See* Defs.' Am. Answer to FAC and Countercls. ¶ 1 [hereinafter "Countercls."], ECF No. 96.)

[14] (*See* Francisco Dep. 191:10–14; Pl.'s Resp. Br. Defs.' Mot. Summ. J. Ex. V at AEROFLOW_0000765 [hereinafter "Disc. Docs."], ECF No. 126.24.)

[15] (*See* Francisco Dep. 192:9–17; Defs.' Mem. Law Supp. Mot. Summ. J. Ex. C Dep. Evan Israel, dated May 11, 2021, at 11:17–12:4, 23:14–21 [hereinafter "Israel Dep."], ECF No. 123.4.)

shipments received.[16]  Francisco additionally claims that he and Israel, on behalf of

Aeroflow, specifically agreed to maintain the confidentiality of BAB's comprehensive

business plan.[17]

9.      Later that day, Francisco attached BAB's new account paperwork, including

BAB's insurance authorization form, to an e-mail to Israel and also provided Israel

with a Dropbox link to various marketing materials for the Maternity Compression

Garments.[18]  Many of these materials were intended to be shared with healthcare

providers and potential customers of BAB's products.[19]

10.     Events moved rapidly from there.  BAB completed its first drop shipment

order for Aeroflow about a week later.[20]  Over the next few weeks, BAB continued to

provide Aeroflow with additional materials to support the sale of the Maternity

---

[16] (*See* Francisco Dep. 208:25–10:7, 245:5–47:16; 3d Francisco Aff. ¶¶ 23–27, 31; Israel Dep. 37:19–38:13, 51:6–52:3; Aff. Evan Israel, dated Oct. 18, 2019, at ¶ 32 [hereinafter "Israel Aff."], ECF No. 22; Pl.'s Resp. Br. Defs.' Mot. Summ. J. Ex. E Aff. Don Francisco, dated Nov. 5, 2019, at ¶¶ 18, 56 [hereinafter "5th Francisco Aff."], ECF No. 126.6.)  BAB describes Exhibit D to its Response Brief to Defendants' Motion for Summary Judgment (the "Response") as "Francisco Affidavit 3" and Exhibit E thereto as "Francisco Affidavit 5."  (*See* 3d Francisco Aff.; 5th Francisco Aff.)  Although no "Francisco Affidavit 4" appears on the docket, the Court will retain BAB's numbering to avoid confusion.

[17] (Francisco Dep. 207:13–23, 217:14–18:23, 223:10–20; 3d Francisco Aff. ¶¶ 25, 28–29.)

[18] (*See* Defs.' Mem. Law Supp. Mot. Summ. J. Ex. I at AEROFLOW_000696–99 [hereinafter "Defs.' Br. Supp. Ex. I"], ECF No. 123.10; Disc. Docs. at AEROFLOW_0000693; Francisco Dep. 223:10–24:17, 262:16–63:25; Israel Dep. 41:5–13.)

[19] (*See* Francisco Dep. 223:10–24:17; Israel Aff. ¶¶ 44–47; Defs.' Br. Supp. Ex. I at AEROFLOW_000698.)

[20] (*See* 5th Francisco Aff. ¶ 58.)

Compression Garments[21] and Francisco led an on-site training to educate Aeroflow employees on BAB's products at the end of August 2018.[22] But Aeroflow claims that, as early as September 2018, the demand for BAB's products began to outpace its ability to fulfill orders,[23] and Aeroflow began ordering the Maternity Compression Garments directly from Fansl, BAB's factory in China.[24] Aside from individual purchase orders for each shipment of BAB products, BAB and Aeroflow never entered into a written contract.[25]

11. During this same time, Motif, a wholly owned subsidiary of Aeroflow, was developing its own line of post-partum compression garments.[26] Motif ordered BAB's Maternity Compression Garments through Amazon,[27] located BAB's Chinese

---

[21] (*See* Israel Dep. 38:23–39:5; 3d Francisco Aff. ¶ 27; 5th Francisco Aff. ¶¶ 57, 59, 62, 69.)

[22] (*See* Israel Dep. 33:23–34:19; 3d Francisco Aff. ¶ 16; 5th Francisco Aff. ¶ 68.)

[23] (*See* Aff. Jennifer Jordan, dated Oct. 18, 2019, at ¶¶ 7–9 [hereinafter "Jordan Aff."], ECF No. 23; Jordan Aff. Ex. C, ECF No. 23.3; Disc. Docs. at AEROFLOW_0000834; *see also* Wright Aff. ¶¶ 16–22.)

[24] (*See* 5th Francisco Aff. ¶¶ 68, 72.)

[25] (*See* Francisco Dep. 215:6–14; Israel Aff. ¶ 36.)

[26] (*See* Countercls. ¶ 4; Disc. Docs. at AEROFLOW_000609, 2482, MOTIF_0000174–92, 861–63, 1703.)

[27] (*See* Aff. Brandon Fonville, dated Oct. 18, 2019, at ¶ 6 [hereinafter "Fonville Aff."], ECF No. 24; Disc. Docs. at AEROFLOW_0000588–90.)

manufacturer after searching public records,[28] and ultimately entered into a contract with the same manufacturer to produce its own post-partum compression garments.[29]

12.    Aeroflow began to sell Motif's post-partum compression garments in January 2019[30] and stopped ordering BAB's products in March 2019.[31]  Aeroflow claims that it sold both BAB's and Motif's post-partum compression garments without identifying the particular brand customers would receive until Aeroflow's inventory of BAB products was depleted in 2020 and thereafter sold only Motif's products.[32]

13.    BAB initiated this action against Defendants on 23 August 2019[33] and subsequently filed its First Amended Complaint on 20 December 2019.[34]

14.    Defendants moved to dismiss all claims on 9 January 2020 and, after a hearing on the motion, the Court dismissed the following claims: (i) constructive fraud; (ii) joint venture; (iii) fraud and fraudulent concealment, except to the extent those claims are based on the July 19 Call; (iv) common law unfair competition and violations of North Carolina's Unfair and Deceptive Trade Practices Act (the

---

[28] (*See* Disc. Docs. at AEROFLOW_0000609.)

[29] (*See* Disc. Docs. at MOTIF_0000891–93, AEROFLOW_0002440; Fonville Aff. ¶ 9.)

[30] (*See* Fonville Aff. ¶ 9; *see also* Disc. Docs. at AEROFLOW_0000809, 822, 824.)

[31] (*See* Defs.' Mem. Law Supp. Mot. Summ. J. Ex. D Dep. Jennifer Jordan, dated May 10, 2021, at 53:4–54:7 [hereinafter "Jordan Dep."], ECF No. 123.5.)

[32] (*See* Jordan Dep. 74:3–17; 5th Francisco Aff. ¶¶ 38–39; Disc. Docs. at MOTIF_0000494; Pl.'s Resp. Br. Defs.' Mot. Summ. J. Ex. S at VF004802 [hereinafter "Pl.'s Resp. Ex. S"], ECF No. 126.21.)

[33] (Compl., ECF No. 3.)

[34] (FAC.)

"UDTPA"), N.C.G.S. § 75-1.1, except to the extent those claims are based on the July 19 Call; and (v) common law unfair competition and violations of the UDTPA and the federal Lanham Act, 15 U.S.C. § 1125(a), except to the extent those claims are based on BAB's allegations that Defendants sold BAB's products as if they were Defendants' own. *See Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at *37–38, *46–47 (N.C. Super. Ct. Nov. 4, 2020).

15. Defendants filed their Answer on 14 December 2020[35] and, after receiving leave of the Court, later filed their Amended Answer to First Amended Complaint and Counterclaims on 16 September 2021, asserting counterclaims for defamation per se, tortious interference with prospective economic advantage, and violations of the UDTPA.[36]

16. BAB filed its Answer to Counterclaims, Defenses, and Further Counterclaims on 2 November 2021.[37] After motions practice, BAB dismissed its further counterclaims without prejudice,[38] and Defendants dismissed their second and third counterclaims without prejudice shortly thereafter.[39]

17. Defendants filed the Motion on 7 February 2022, seeking summary judgment on BAB's remaining claims for (i) trade secret misappropriation; (ii) breach

[35] (Defs.' Answer to FAC, ECF No. 65.)

[36] (*See* Countercls. ¶¶ 49–66.)

[37] (Pl.'s Answer to Countercls., Defenses, & Further Countercls., ECF No. 106.)

[38] (*See* Notice Dismissal All Further Countercls. Without Prejudice, ECF No. 118.)

[39] (*See* Notice Partial Dismissal Countercls. Without Prejudice [hereinafter "Notice Partial Dismissal"], ECF No. 121.)

of the duty of good faith and fair dealing; (iii) fraud and fraudulent concealment to the extent those claims are based on the July 19 Call, (iv) common law unfair competition and violations of the UDTPA and the Lanham Act to the extent those claims are based on BAB's allegations that Defendants sold BAB's products as if they were Defendants' own; (v) common law unfair competition and violations of UDTPA to the extent those claims are based on the July 19 Call; and (vi) unjust enrichment. After full briefing, the Court held a hearing on the Motion on 20 May 2022 (the "Hearing"), at which all parties were represented by counsel. The Motion is now ripe for resolution.

## II.

## LEGAL STANDARD

18. Under Rule 56(c), "[s]ummary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [the movant] is entitled to a judgment as a matter of law.' " *Da Silva v. WakeMed*, 375 N.C. 1, 10 (2020) (quoting N.C. R. Civ. P. 56(c)). "A genuine issue of material fact 'is one that can be maintained by substantial evidence.' " *Curlee v. Johnson*, 377 N.C. 97, 2021-NCSC-32, ¶ 11 (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335 (2015)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681 (2002) (cleaned up). "An issue is material if, as alleged, facts 'would constitute a legal

defense, or would affect the result of the action or if its resolution would prevent the party against whom it is resolved from prevailing in the action.' " *Bartley v. City of High Point*, 381 N.C. 287, 2022-NCSC-63, ¶ 13 (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972)). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Belmont Ass'n v. Farwig*, 381 N.C. 306, 2022-NCSC-64, ¶ 15 (quoting *Dalton v. Camp*, 353 N.C. 647, 651 (2001)).

19. "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002). The movant may meet this burden either (1) "by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense," or (2) "by showing through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (cleaned up). If the movant meets its burden, "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating that the nonmoving party will be able to make out at least a prima facie case at trial[.]" *Cummings v. Carroll*, 379 N.C. 347, 2021-NCSC-147, ¶ 21 (cleaned up); *see also* N.C. R. Civ. P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

III.

ANALYSIS

A.    Trade Secret Misappropriation

20.    BAB has asserted a claim against Defendants for misappropriation of BAB's alleged trade secret in violation of the North Carolina Trade Secret Protection Act (the "NCTSPA"), N.C.G.S. §§ 66-152 to -62, alleging that Aeroflow disclosed the components of BAB's comprehensive business model to Motif so that Motif could launch its own competing line of post-partum compression garments that qualified for insurance reimbursement.[40]    Defendants seek dismissal of BAB's misappropriation claim, contending that the undisputed evidence establishes that (i) BAB has not defined its purported trade secret with sufficient particularity; (ii) the parts of the alleged trade secret that BAB has identified are publicly available and readily ascertainable; (iii) BAB has not taken reasonable efforts to protect the secrecy of its purported trade secret; and (iv) even if the Court concludes BAB had a protectable trade secret, there is no evidence in the current record that either Aeroflow or Motif misappropriated it.[41]

21.    The NCTSPA provides that an "owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret."  N.C.G.S. § 66-153.  The NCTSPA defines a protectable trade secret as follows:

---

[40] (*See* Pl.'s Resp. Br. Defs.' Mot. Summ. J. 9–18 [hereinafter "Pl.'s Resp."], ECF No. 126.)

[41] (*See* Defs.' Mem. Law Supp. Mot. Summ. J. 7–18 [hereinafter "Defs.' Br. Supp."], ECF No. 123.)

business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

22.    Our courts consider the following six factors in determining whether information constitutes a trade secret:

(1) [t]he extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; [(4)] the value of information to [the] business and its competitors; [(5)] the amount of effort or money expended in developing the information; and [(6)] the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81 (1997) (citation omitted).  "These factors overlap, and courts do not always examine them separately and individually."  *DSM Dyneema, LLC v. Thagard*, 2019 NCBC LEXIS 44, at *21 (N.C. Super. Ct. June 19, 2019).

      1.  Sufficient Particularity

23.    "To prevail under the NCTSPA, 'a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur.' "  *Aym Techs., LLC v. Rodgers* (*Aym Techs. I*), 2019 NCBC LEXIS 64, at *15 (N.C. Super. Ct. Oct. 16, 2019) (quoting *Krawiec v. Manly*, 370 N.C.

602, 609 (2018)).  While "[t]his 'sufficient particularity' standard does not require a party to define every minute detail of its trade secret down to the finest detail[,]" *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at \*25 (N.C. Super. Ct. Apr. 23, 2015) (cleaned up), "[a] plaintiff may not simply make 'general allegations in sweeping and conclusory statements,' " *Aym Techs. I*, 2019 NCBC LEXIS 64, at \*15 (quoting *Washburn v. Yakin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 327 (2008)).

24.    Beginning with the First Amended Complaint, BAB has identified its alleged trade secret as its "business process and model," a "cocktail" or "synergy" of components consisting of "[u]nique scientific designs, compilation of relevant diagnostic codes, product design-medical condition scientific connection, positioning for insurance coverage, [and] riding the lines of breast pump distribution[.]"[42] Defendants contend that "BAB's trade secret description grew broader" during discovery to encompass "everything [Francisco] ever developed[,]"[43] including BAB's product images, product descriptions, technical design packs, marketing literature, sizing charts, white papers, insurance authorization forms, training materials, and manufacturing facility.[44]

---

[42] (FAC ¶¶ 245–59; *see also* Pl.'s Resp. 10; 1st Francisco Aff. ¶ 11; 3d Francisco Aff. ¶¶ 5, 7, 24–26; 5th Francisco Aff. ¶¶ 8, 10–14, 23.)

[43] (Defs.' Br. Supp. 9 (quoting Francisco Dep. 218:14).)

[44] (*See* Francisco Dep. 163:24–64:5, 218:16–19, 220:6–15, 270:16–71:4; 5th Francisco Aff. ¶ 44; Pl.'s Resp. Ex. F Aff. Don Francisco, dated Mar. 9, 2022, at ¶¶ 3–4, 8 [hereinafter "6th Francisco Aff."], ECF No. 126.7.)

25.     Defendants further contend that not only has BAB expanded the scope of its purported trade secret, but BAB has also "refused to identify all of the components of [its] process or model[,]" thereby preventing Defendants from determining what they are accused of misappropriating.[45]  Defendants point out that each time Francisco was asked to identify all of the components of BAB's alleged trade secret during his deposition, Francisco responded by listing several components followed by a qualifier such as "to name a few[,]"[46] "it's not exclusive of anything I've done[,]"[47] and "I think that is a smattering of the things they took in order to get where they are."[48] Defendants argue that Francisco's affidavit testimony is equally vague, consisting of non-exclusive lists of the purported components that make up BAB's comprehensive business model.[49]

26.     Despite BAB's reluctance to provide an exhaustive list of the specific components that, collectively, constitute its business process, BAB has consistently identified the following as parts of its alleged trade secret:

---

[45] (Defs.' Br. Supp. 9.)

[46] (Francisco Dep. 218:19.)

[47] (Francisco Dep. 219:15–16.)

[48] (Francisco Dep. 164:18–19.)

[49] (*See* 5th Francisco Aff. ¶ 44 (listing of BAB's "self-developed, trade secret components" followed by "etc."); 6th Francisco Aff. ¶ 8 (alleging that Aeroflow agreed that all BAB materials and processes "including but not limited to" a list of items were the exclusive property of BAB).)

- The Maternity Compression Garments, including technical design packs, product images, product descriptions, marketing literature, and sizing charts;

- The scientific design of the Maternity Compression Garments to treat specific medical conditions, including supporting white papers;

- The positioning of the Maternity Compression Garments to qualify for insurance reimbursement as DME, including the compilation of relevant codes and insurance authorization forms; and

- The integration of the Maternity Compression Garments into preexisting national DME channels for breast pump sales.

27. BAB bears the burden of pleading its purported trade secret with particularity, *see Aym Techs. I*, 2019 NCBC LEXIS 64, at \*15, and had multiple opportunities to definitively delineate every component of its business process. The Court rejects BAB's attempt to keep its trade secret open-ended but nonetheless concludes that BAB has pleaded its alleged trade secret—consisting only of those components bullet-listed above—with sufficient particularity to advance its claim.

2. Publicly Available and Readily Ascertainable

28. A trade secret must "[d]erive[ ] independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering[.]" N.C.G.S. § 66-152(3)(a). "Consequently, compilations comprised solely of publicly available information are generally not recognized as trade secrets." *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at \*26.

29. "[P]rotection of a process comprised of published components 'turns on how easy or difficult it is to assemble the relevant elements into the secret combination.'" *SCR-Tech LLC v. Evonik Energy Servs. LLC*, 2011 NCBC LEXIS 27, at \*42 (N.C. Super. Ct. July 22, 2011) (quoting *Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 943 (N.D. Cal. 2007)). Specifically,

> [i]f all the individual parts of a process are in the public domain, so that through specific disclosures the entire process can be generally known or readily ascertainable through the independent development by those who can obtain economic value through the disclosure, then that entire process will lose any trade secret protection. If part of the process becomes known, but other steps remain undisclosed, then the secret steps may maintain trade secret protection. . . .
>
> . . . [C]omparing the publication of component parts of a process to a trade secret claim in the overall process involves a mixture of fact and law.

*Id.* at \*42–45.

30. Defendants first argue that each of the individual components of BAB's alleged trade secret were available in the public domain and easily attainable by Defendants.[50] The Court agrees.

31. As an initial matter, it is undisputed that the Maternity Compression Garments were available for purchase from various online retailers, including BAB itself,[51] and were not protected by patents or copyrights.[52] Defendants could—and

---

[50] (*See* Defs.' Br. Supp. 11.)

[51] (*See, e.g.*, Francisco Dep. 84:16–85:4, 157:11–13; Disc. Docs. at AEROFLOW_0000588–90, 798.)

[52] (*See* Francisco Dep. 281:16–21; May 20, 2022 Hr'g Tr. 64:13–15, 65:8–10 [hereinafter "Tr."], ECF No. 137.)

did—purchase BAB's Maternity Compression Garments to reverse engineer their own competing products.[53] Moreover, these online retailers included product images, product descriptions, sizing charts, and a list of features and benefits on their websites to promote the sale of the Maternity Compression Garments, which Defendants viewed prior to the July 19 Call.[54]

32.  In opposition, BAB argues that (i) Motif's competing products were not only a product of reverse engineering but were also designed using BAB's confidential technical design packs, which were not publicly available;[55] and (ii) Defendants relied on "complex international back-channels" to obtain these packs from BAB's Chinese manufacturer.[56] The record evidence, however, does not support these assertions.

33.  BAB argues in its Response that "[Motif's] postpartum garments are produced from BAB design tech packs obtained from Fansl[,]"[57] BAB's Chinese manufacturing facility, relying primarily on Francisco's 9 March 2022 affidavit in which he avers that Defendants "stole the designs[.]"[58] At the Hearing on the Motion, Defendants objected to consideration of this affidavit, arguing that BAB was trying

---

[53] (*See* Fonville Aff. ¶ 6; Disc. Docs. at AEROFLOW_0000588–90.)

[54] (*See* Francisco Dep. 263:14–25, 264:18–25; Disc. Docs. at AEROFLOW_0000779–81, 798.)

[55] (*See* Francisco Dep. 165:11–66:16; Israel Aff. ¶ 38.)

[56] (*See* Pl.'s Resp. 12.)

[57] (Pl.'s Resp. 23.)

[58] (Pl.'s Resp. Ex. G Aff. Don Francisco, dated Mar. 9, 2022, at ¶ 63 [hereinafter "7th Francisco Aff."], ECF No. 126.8.)

to "create an issue of material fact through a post-discovery affidavit that is attached to a motion for summary judgment."[59]

34. "A non-moving party cannot create an issue of fact to defeat summary judgment simply by filing an affidavit contradicting his prior sworn testimony." *Kixsports, LLC v. Munn*, 2021 NCBC LEXIS 32, at *31 (N.C. Super. Ct. Apr. 1, 2021) (quoting *Carter v. W. Am. Ins. Co.*, 190 N.C. App. 532, 539 (2008)). During his deposition, Francisco testified that "I did not say [Defendants] took my tech pack. . . . I said they copied my measurements,"[60] which directly contradicts Francisco's March 2022 affidavit testimony. Moreover, other evidence in the record supports Francisco's prior deposition testimony that Defendants acquired the measurements for BAB's products rather than the technical design packs themselves.[61]

35. The Court therefore concludes that, at most, Defendants acquired the measurements for the Maternity Compression Garments from BAB's factory. Because BAB never obtained a patent or a copyright on its compression garments, however, Defendants—and anyone else—were free to purchase BAB's products and reverse engineer them.[62] Having the specific design measurements, while helpful,

---

[59] (Tr. 16:4–17:22.)

[60] (Francisco Dep. 165:8, 65:13.)

[61] (*Compare* Pl.'s Resp. Ex. H, ECF No. 126.9 (under seal), *and* Pl.'s Resp. Ex. U at AEROFLOW_0006142, ECF No. 126.23 (under seal), *with* Pl.'s Resp. Exs. M–O, ECF Nos. 126.15–.17 (under seal).)

[62] (*See* Tr. 65:8–9; Francisco Dep. 157:11–58:22, 281:16–83:10.)

was not necessary for Motif to create its own version of BAB's compression garments.[63]

36. Second, BAB's white papers, which were publicly available on BAB's website, establish the medical necessity for the Maternity Compression Garments, a necessary prerequisite for doctors to prescribe the products and for insurance companies to pay for them. The evidence is undisputed that the white papers were provided to medical offices to educate physicians on the benefits of the products.[64] While BAB does not dispute that its white papers were publicly available,[65] BAB argues that Motif simply rephrased BAB's white papers instead of creating its own.[66]

---

[63] Even if Defendants had obtained BAB's technical design packs from Fansl, the Court would reach the same conclusion. "[W]hen information alleged to be a trade secret is clearly and easily obtained through a single publication, then the source of the actual knowledge the defendant used is not relevant." *SCR-Tech LLC*, 2011 NCBC LEXIS 27, at *48 (citing *Bruning & Federle Mfg. Co. v. Mills*, No. COA04-999, 2005 N.C. App. LEXIS 2111, at *8–9 (N.C. Ct. App. Oct. 4, 2005) (determining that the information necessary to produce a similar design was readily available in a publicly available trade publication)). The undisputed evidence shows that BAB's Maternity Compression Garments had been available for purchase on BAB's website and through various regional DME distributors since at least 2013. (*See* Francisco Dep. 43:12–22, 44:1–24, 84:16–85:4.) A competitor could easily purchase one of the Maternity Compression Garments online to reverse engineer it "through a single publication." As discussed above, because the information necessary to design a competing product was readily available in the public market, the fact Defendants may have additionally acquired BAB's design packs from its Chinese factory is irrelevant. The undisputed evidence also shows that, in less than an hour, Defendants used import records to identify BAB's manufacturing facility, (*see* Disc. Docs. at AEROFLOW_0000609), and, with the help of Defendants' preexisting contacts in China, established contact with Fansl within a week, (*see* Disc. Docs. at MOTIF_0000551–53). Despite BAB's contrary assertion, the undisputed record evidence establishes that Defendants encountered little difficulty in contacting BAB's manufacturing facility.

[64] (*See* Francisco Dep. 188:2–24, 220:6–20, 225:11–14, 226:17–27:3.)

[65] (*See* Francisco Dep. 226:17–27:3.)

[66] (*See* Pl.'s Resp. 12.)

But rather than advance BAB's trade secret claim, Motif's ability to access BAB's white papers and hire a medical professional to rewrite them[67] demonstrates the ease with which Motif was able to acquire and duplicate this component.

37. Third, the undisputed evidence shows that the various codes needed to obtain insurance reimbursement for DME products were publicly available and known to DME distributors. Indeed, the diagnostic codes used by providers to prescribe the Maternity Compression Garments are publicly available in the ICD-10, a compilation of medical diagnosis and procedure codes.[68] Similarly, the DME classification codes used by insurance companies to process the associated reimbursement claims are publicly available on the Centers for Medicare and Medicaid Services' website, among others.[69] It is undisputed that, as part of their routine business practices, DME distributors, such as Defendants, determine which diagnostic and insurance codes to use to obtain insurance reimbursement for DME products.[70]

38. BAB's argument that Defendants encountered difficulty in "obtaining the pertinent insurance codes before contacting BAB[ ]" is therefore a non-starter.[71] The

---

[67] (*See, e.g.*, Francisco Dep. 226:17–27:3; Disc. Docs. at AEROFLOW_0001432–35.)

[68] (*See* Francisco Dep. 71:14–21; Israel Aff. ¶ 9.)

[69] (*See* Francisco Dep. 69:20–70:17, 74:5–11; Israel Aff. ¶ 9.)

[70] (*See* Francisco Dep. 249:8–50:16; Israel Aff. ¶¶ 10–11, 13–18, 29.)

[71] (Pl.'s Resp. 12; *see* Disc. Docs. at AEROFLOW_0000798 ("I don't see codes on the websites.").)

undisputed evidence shows that, although Aeroflow may not have known the exact diagnostic and insurance codes to use prior to the July 19 Call, Aeroflow could have readily discovered them without relying on BAB's information. The relevant codes were easily obtained from public sources.[72] Aeroflow, an established DME distributor, regularly determines which diagnostic and insurance codes to use to obtain insurance reimbursement for a new DME product.[73] In the days leading up to the July 19 Call, e-mails between Aeroflow and Motif employees demonstrate that Aeroflow was in the process of determining the appropriate codes and selecting an insurer to test the viability of seeking DME reimbursement for post-partum compression garments.[74] The Court concludes that the undisputed evidence, taken in the light most favorable to BAB, shows that Aeroflow did not encounter "difficulties" obtaining the necessary insurance codes.

39. And fourth, BAB relied on Aeroflow to use its distribution channels to distribute BAB's products. As Defendants correctly note, "Aeroflow's distribution channels, and the idea to distribute new products through those channels, are certainly known to Aeroflow and are a part of Aeroflow's own business model."[75] Aeroflow's distribution network was therefore readily ascertainable and cannot serve as part of BAB's misappropriation of trade secrets claim.

---

[72] (*See* Francisco Dep. 69:20–70:17, 71:14–21, 74:5–11; Israel Aff. ¶ 9.)

[73] (*See* Israel Aff. ¶¶ 10–11, 13–18, 29; *see also* Francisco Dep. 249:8–50:16.)

[74] (*See* Disc. Docs. at AEROFLOW_0000779–81, 798, 913–16.)

[75] (Defs.' Br. Supp. 12.)

40. The Court therefore finds BAB's argument that the individual components of its alleged trade secret were not publicly available and/or readily ascertainable by Defendants without merit.

41. Defendants also contend, and the Court agrees, that the undisputed evidence shows that "other DME distributors were publicly practicing BAB's entire purported comprehensive business plan prior to BAB making contact with Aeroflow."[76]

42. Francisco admits that he had approached other DME distributors about selling BAB's post-partum compression garments.[77] As part of those discussions, Francisco shared his strategy for selling BAB's products "next to breast pumps, and further that patient's value in selling [BAB's] products through insurance."[78] Francisco also testified that he provided "parts" of his comprehensive business plan to other DMEs, including "brochures, papers, product descriptions, things that help them market the product[.]"[79]

43. In particular, in 2017, BAB approached 1NW, a regional DME distributor, about selling BAB's post-partum compression garments using its "proven" business

[76] (Defs.' Br. Supp. 12.)

[77] (*See* Francisco Dep. 95:6–97:6.)

[78] (Francisco Dep. 96:5–97:3.)

[79] (Francisco Dep. 243:8–9.)

model.[80]  BAB suggested that 1NW market BAB's products to women purchasing breast pumps.[81]  BAB provided 1NW with "[m]arketing collateral, papers, product descriptions, reviews from prior patients and clients," brochures, catalogs, and white papers to support sales of BAB's products on 1NW's website.[82]  After receiving the relevant DME reimbursement codes from BAB, 1NW submitted claims to insurance companies on behalf of customers who bought BAB's post-partum compression garments.[83]

44.  Not only did 1NW publicly utilize BAB's business process, but the undisputed evidence shows that Defendants learned about it by visiting 1NW's website (as well as others) prior to the July 19 Call.  In an e-mail dated 13 July 2018, Josh Hill ("Hill"), an Aeroflow employee, sent Israel links to three websites selling post-partum recovery garments and noted that the websites did not include the applicable insurance codes.[84]  On 16 July 2018, Brandon Fonville ("Fonville"), a director at Motif, forwarded an e-mail with the subject line "Test – Postpartum Recovery Apparel" to Israel and Hill, which consisted of 1NW's product page for

---

[80] (*See* Francisco Dep. 107:4–17 ("I came to [1NW] with a product and a concept in hand to plug in.  No changes, no vetting, no proof of concept did they participate in.  They scaled what had already been proven."); *see also* Francisco Dep. 108:18–21; Wright Aff. ¶ 9.)

[81] (*See* Francisco Dep. 171:20–74:10, 176:4–24; Wright Aff. at AEROFLOW_007298.)

[82] (Francisco Dep. 115:19–23, 126:19–29:19; *see* Wright Aff. ¶ 12, at AEROFLOW_007294–95, 7319.)

[83] (*See* Francisco Dep. 144:15–45:19; Wright Aff. ¶¶ 9, 15.)

[84] (*See* Disc. Docs. at AEROFLOW_0000798.)

BAB's post-partum compression garments.[85]  The product page included a product description, product images, sizing information, a list of product benefits and features, and information about how to seek insurance reimbursement.[86]  In this same e-mail, Fonville asked Israel whether he had decided with which insurance companies to test reimbursement and Israel responded a short time later that he had.[87]

45.    The undisputed evidence shows that by 16 July 2018, Defendants had discovered that other DME distributors were selling BAB's post-partum compression garments online; viewed the product descriptions, images, sizing information, and benefits and features; determined that the products qualified for DME reimbursement; and were actively engaged in finding the applicable codes.  Although Defendants did not have the relevant codes prior to the July 19 Call, Aeroflow, as a DME distributor, regularly determined which codes should be used to obtain insurance coverage for products as part of its routine business practices.[88]  And Francisco conceded that he does not know if Aeroflow used the codes BAB provided and acknowledged that determining the appropriate insurance codes is the "nature

---

[85] (Disc. Docs. at AEROFLOW_0000779–81.)

[86] (*See* Disc. Docs. at AEROFLOW_0000779–81.)

[87] (*See* Disc. Docs. at AEROFLOW_0000913–16.)

[88] (*See* Israel Aff. ¶¶ 11, 14–19.)

of [Aeroflow's] business," and that it would have been "prudent" for Aeroflow to conduct its own due diligence to verify the appropriate reimbursement codes.[89]

46.     Thus, the undisputed evidence shows that BAB's entire business model was publicly in use and known to Defendants prior to the July 19 Call.  The Court therefore concludes as a matter of law that BAB's comprehensive business model cannot constitute a protectable trade secret.[90]

3. Reasonable Efforts to Maintain Secrecy

47.     The Court also agrees with Defendants that "[t]he undisputed facts demonstrate that BAB failed to take any reasonable efforts to maintain the secrecy of its purported trade secret," a further basis on which BAB's misappropriation claim must be dismissed.[91]

---

[89] (Francisco Dep. 249:8–50:13.)

[90] In its Response, BAB also contends that Francisco's significant investment of time, research, and money in the development of the Maternity Compression Garments and its business model creates an issue of fact as to whether BAB's business process constitutes a trade secret, (see Pl.'s Resp. 11), but the Court finds BAB's argument unavailing.  Although Francisco took years to design the Maternity Compression Garments and develop each of the components of BAB's business process, (see, e.g., 2d Francisco Aff.; 3d Francisco Aff. ¶¶ 1–9, 18), as Defendants point out and Francisco himself admits, Francisco had never developed a product or taken one to market, (see Defs.' Reply Supp. Mot. Summ. J. 3 [hereinafter "Defs.' Reply"], ECF No. 131; Francisco Dep. 36:19–37:5, 41:2–18, 73:19–22).  By contrast, each of the components of BAB's alleged trade secret—the development of a DME product tied to a specific medical condition, the identification of the relevant diagnostic and insurance billing codes, and the promotion of the product through a distributor's preexisting channels—are ordinary parts of a DME distributor's business process.  (See Francisco Dep. 114:18–21, 250:2–16; 5th Francisco Aff. ¶¶ 14–16; Israel Aff. ¶¶ 10–11, 13–18, 29.)  Based on this record, the fact that it took Francisco years to complete a process that was commonplace in the DME industry does not weigh in favor of finding the existence of a trade secret.

[91] (Defs.' Br. Supp. 12.)

48. For an actionable trade secret to exist, the evidence must show that the claimant undertook "efforts that are reasonable under the circumstances to maintain its secrecy." N.C.G.S. § 66-152(3)(b). This "inquiry is fact-specific, and courts that have addressed it closely examine the circumstances surrounding the trade secret to determine what measures are reasonable." *Encompass Servs., PLLC v. Maser Consulting P.A.*, 2021 NCBC LEXIS 59, at *27 (N.C. Super. Ct. June 28, 2021) (cleaned up). "Even if information was initially secret and the claimant intended that trade secret information be confidential, trade secret protection can be lost if adequate measures were not taken to insure [sic] that the information was, in fact, kept confidential." *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at *27.

49. In addition to its alleged oral agreement with Aeroflow, BAB points to the following measures it took to protect the confidentiality of its comprehensive business model: (i) entering into oral confidentiality agreements with Fansl and 1NW;[92] (ii) requesting that Aeroflow keep the identity of BAB's factory confidential in a November 2018 e-mail;[93] (iii) including a generic confidentiality statement in the signature block of every e-mail communication BAB sent to Defendants;[94] and (iv) never providing Aeroflow with its technical design packs for the Maternity Compression Garments.[95] The Court will briefly examine each of these in turn.

---

[92] (*See* Pl.'s Resp. 13; Tr. 195:22–96:3, 278:2–7; 6th Francisco Aff. ¶¶ 17–23.)

[93] (*See* Pl.'s Resp. 14; Defs.' Br. Supp. Ex. K, ECF No. 123.12.)

[94] (*See* Pl.'s Resp. 14; *see, e.g.*, Disc. Docs. at AEROFLOW_0000539.)

[95] (*See* Pl.'s Resp. 13.)

50.     BAB first contends that "[t]he evidence . . . demonstrates Francisco's practice of requiring *all parties* to maintain confidentiality to capitalize on the emerging market he created."[96]  The Court disagrees.  Although Francisco testified that he entered into oral confidentiality agreements with both Fansl and 1NW,[97] which 1NW disputes,[98] BAB fails to provide any evidence that it obtained oral or written non-disclosure agreements to protect the confidentiality of its alleged trade secret from its employees, the medical practice it worked with to develop its insurance reimbursement model, the insurance companies to which BAB disclosed its insurance codes, the physicians who provided BAB with the scientific studies for its white papers, the DME distributors to which BAB pitched its products, or the roughly thirty other DME distributors that had been selling BAB's products since at least 2013.  Moreover, Francisco admits that seeking a written confidentiality agreement from Aeroflow would have been reasonable.[99]  The undisputed evidence therefore shows that BAB did *not* require all parties to maintain the confidentiality of its business process and, instead, demonstrates BAB's inconsistent efforts at ensuring the secrecy of its alleged trade secret.  Courts have found that no trade secret exists under similar circumstances.  *See, e.g.*, *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d

---

[96] (Pl.'s Resp. 13 (emphasis added).)

[97] (*See* Francisco Dep. 165:11–66:16; Israel Aff. ¶ 38.)

[98] (*See* Wright Aff. ¶ 26.)

[99] (*See* Francisco Dep. 234:19–25.)

890, 903 (Minn. 1983) (holding that no trade secrets existed where plaintiff did not consistently treat the information as secret).

51. With regard to BAB's second argument, the Court has already determined that the identity of BAB's manufacturer is not part of BAB's alleged trade secret and, moreover, had already been discovered by Defendants in August 2018. However, by making this request for confidentiality in writing, the Court agrees with Defendants that "BAB demonstrated the reasonableness of stating in writing the confidential nature of particular information that it sent to Aeroflow."[100] Aside from this one e-mail, Francisco cannot recall whether *any* of the other materials BAB provided to Aeroflow were in some way marked "confidential" on their face.[101] Although Francisco agreed that he had the ability to stamp or otherwise indicate that particular documents were "confidential,"[102] the Court notes that BAB has not pointed to any other materials in the record provided to Defendants by BAB that bear a confidentiality designation.[103]

---

[100] (Defs.' Br. Supp. 14.)

[101] (*See* Francisco Dep. 229:15–21, 264:1–17, 268:23–69:7.)

[102] (Francisco Dep. 269:8–17.)

[103] This is in contrast to *TaiDoc Tech. Corp. v. OK Biotech Co.*, 2016 NCBC LEXIS 26 (N.C. Super. Ct. Mar. 28, 2016), on which BAB relies as support for the reasonableness of its efforts to maintain secrecy. (*See* Pl.'s Resp. 13–14.) In *TaiDoc*, plaintiff took several additional steps to clearly identify the confidential nature of the individual documents at issue in that case, such as "affixing confidentiality labels on documents sent to [defendant], requiring [defendant] to sign confidentiality acknowledgments on every page of all 510(k)s," and, in the single instance in which plaintiff allowed defendant to disclose two pages of a document that plaintiff alleged to be part of its trade secret, marking both pages as "confidential." *TaiDoc Tech. Corp.*, 2016 NCBC LEXIS 26, at *22, *24–25. With the exception of the November 2018

52. Perhaps in recognition of this fact, BAB contends that the language included in the signature block of its e-mail communications with Defendants was sufficient to put Defendants on notice that the materials BAB sent to Aeroflow were confidential.[104] The confidentiality disclaimer reads as follows:

> This message and any attachments are confidential and privileged information intended for the designated recipient(s) only. If you are not the intended recipient then any disclosing, copying, or distributing of this message and contents is prohibited. Should you receive this message in error, please discard or reply to sender – thank you.[105]

53. As Defendants argued at the Hearing, however, this language "indicates implicitly that if you were an authorized recipient of the email [and] there is no dispute that Aeroflow was an authorized recipient and the intended recipient . . . , they could share."[106] Defendants' interpretation is bolstered by the fact that BAB expected Aeroflow to share particular parts of BAB's business plan with third parties in order to successfully sell BAB's products.[107] But despite BAB's insistence that "only the proper parties receive the proper materials,"[108] BAB did not provide Aeroflow with specific instructions regarding which parts of BAB's alleged trade

---

e-mail, BAB has not put forth any evidence that it took similar additional steps to denote the confidentiality of any of its materials.

[104] (*See* Pl.'s Resp. 14; Francisco Dep. 228:10–29:14, 233:25–34:5, 260:15–62:14.)

[105] (*See, e.g.*, Disc. Docs. at AEROFLOW_0000539.)

[106] (Tr. 29:7–11.)

[107] (*See* Francisco Dep. 220:6–20, 221:11–23:2, 224:1–17, 225:11–14, 234:13–18.)

[108] (Defs.' Br. Supp. 15.)

secret Aeroflow could share with its own employees, much less with third parties.[109]

Nor did the materials on their face clearly indicate whether they may be disclosed and, if so, to whom.[110] Moreover, as discussed above, all of the components of BAB's alleged trade secret were publicly available prior to the July 19 Call, and BAB had not taken any steps to limit their accessibility to certain persons prior to that time. The Court therefore concludes that the inclusion of such boilerplate confidentiality language in the signature block of Francisco's e-mails was not sufficient to alert Defendants that the contents of or attachments to a particular e-mail contained BAB's confidential trade secret information.

54. Finally, the Court has already rejected BAB's last argument, determining that the undisputed evidence shows that, at most, Defendants acquired a portion of BAB's technical design packs—namely, the measurements for the Maternity Compression Garments—from Fansl. The technical design packs were but one component of BAB's alleged trade secret and, because the garments were publicly available for purchase without copyright or patent protection, such information was merely additive rather than necessary to reverse engineer BAB's products.

---

[109] (*See* Francisco Dep. 126:19–33:9, 221:22–29:3 ("[Aeroflow] should have been well aware how and where they could use those materials."), 266:4–67:15.) While it is true that "a holder may divulge his information to a limited extent without destroying its status as a trade secret[,]" *Metallurgical Indus. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986), the individual components of BAB's alleged trade secret were intended to be provided to third parties and the business process as a whole was publicly in view. This is not an instance where the alleged trade secret was divulged only "to a limited extent[.]"

[110] (*See* Francisco Dep. 266:4–69:7.)

55.    "Courts do not require absolute secrecy at all times and in all circumstances to maintain trade secret protection[,]" *TaiDoc*, 2016 NCBC LEXIS 26, at \*25, but "trade secret protection can be lost if adequate measures were not taken to insure [sic] that the information was, in fact, kept confidential[,]" *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at \*27.   The undisputed evidence shows that all of the components of BAB's alleged trade secret were intended to be shared with third parties and were available in the public domain prior to BAB's first contact with Defendants.  As a result, the Court concludes as a matter of law that BAB's efforts were not reasonable under the circumstances to maintain the secrecy of its alleged trade secret.

56.    For each of these reasons, therefore, BAB's claim for misappropriation of trade secrets must be dismissed.[111]

B.    <u>Breach of the Duty of Good Faith and Fair Dealing</u>

57.    BAB has also asserted a claim against Aeroflow for breach of an implied duty to act in good faith and engage in fair dealing in the performance of its obligations under an alleged oral agreement between Aeroflow and BAB to purchase BAB's garments, to sell them exclusively, and to keep BAB's information confidential.[112]  Defendants seek dismissal, contending that the undisputed evidence establishes that BAB and Aeroflow did not enter into an enforceable oral contract

---

[111] In light of the Court's conclusions as set forth above, the Court need not address Defendants' further contention that BAB's claim should be dismissed for failure to offer evidence of Defendants' alleged misappropriation.

[112] (*See* FAC ¶¶ 63–64, 226–29.)

during the July 19 Call and, even if they did, Aeroflow did not breach an implied duty of good faith and fair dealing with respect to its obligations under that contract.[113]

58.     In their Memorandum of Law in Support of the Motion, Defendants argue without opposition that the parties did not enter into an enforceable oral contract during the July 19 Call because (i) "[a] contract for the sale of goods at a price greater than $500 will not be enforced unless it is in writing[;]"[114] (ii) BAB "now admits that Aeroflow never promised to sell BAB's garments exclusively[;]"[115] and (iii) the alleged promise of confidentiality was "too ambiguous for there to have been mutual assent."[116]  Because BAB has not responded to Defendants' arguments, BAB's good faith and fair dealing claim—which depends upon that alleged oral contract—must be dismissed.  *See, e.g.*, *Kixsports, LLC*, 2021 NCBC LEXIS 32, at \*42–43 (granting summary judgment when plaintiffs presented no argument or evidence in support of claim); *Bennett v. Bennett*, 2020 NCBC LEXIS 147, at \*15 (N.C. Super. Ct. Dec. 16, 2020) (same).

59.     In addition, even if BAB had been able to establish the existence of an alleged oral contract, for its evidence of breach, BAB simply asserts, in conclusory fashion and without citation to the record, that "Defendants engaged in conduct with

---

[113] (*See* Defs.' Br. Supp. 18–21; *see also* Francisco Dep. 126:19–33:9, 165:8–13, 215:6–17:1, 221:22–29:3, 259:15–60:4, 266:4–67:15; Fonville Aff. ¶¶ 5–8; Disc. Docs. at AEROFLOW_0000609.)

[114] (Defs.' Br. Supp. 19 (citing N.C.G.S. § 25-2-201(1)).)

[115] (Defs.' Br. Supp. 20 (citing Francisco Dep. 216:22–17.1).)

[116] (Defs.' Br. Supp. 20.)

the intent to deprive BAB of the benefit it expected under the oral confidentiality agreement[ ]" and "not only breached their duty to act in good faith in the performance of the obligations of the oral agreement, but they also had no intentions of ever maintaining the confidentiality of BAB's information[.]"[117] But as one federal court has observed, "saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it [is] not the . . . court's job to sift through the record and make [the non-moving party's] case for [it]." *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010);[118] *see also Rodriguez v. Elon Univ.*, No. 1:17CV165, 2018 U.S. Dist. LEXIS 76211, at *19 (M.D.N.C. Apr. 27, 2018) (granting summary judgment when plaintiff characterized the purported evidence instead of providing citations to the record); *Brown v. Secor*, 2020 NCBC LEXIS 134, at *24 (N.C. Super. Ct. Nov. 13, 2020) (granting summary judgment when plaintiff failed to cite any evidence); *Brewster v. Powell Bail Bonding, Inc.*, 2020 NCBC LEXIS 27, at *9 (N.C. Super. Ct. Mar. 11, 2020) (same).

60.    Because BAB has failed in its Response to "set forth *specific facts* showing that there is a genuine issue for trial[,]" N.C. R. Civ. P. 56(e) (emphasis added), it has failed to carry its burden to "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial[,]" *Cummings*, 2021-NCSC-

---

[117] (Pl.'s Resp. 22.)

[118] "Although [North Carolina courts] are not bound by federal case law, we may find their analysis and holdings persuasive." *Ellison v. Alexander*, 207 N.C. App. 401, 405 (2010) (citation and quotation marks omitted).

147, ¶ 21 (quoting *DeWitt*, 355 N.C. at 681–82). For this additional reason, therefore, BAB's breach of good faith and fair dealing claim must be dismissed.

C.  Fraudulent Misrepresentation and Fraudulent Concealment

61.  BAB's claims for fraudulent misrepresentation and for fraudulent concealment are limited to statements made by Israel during the July 19 Call.[119] Defendants contend that BAB's fraudulent misrepresentation claim is based on a non-actionable promise to maintain the confidentiality of BAB's comprehensive business plan rather than on any false representation of material fact.[120] With respect to fraudulent concealment, Defendants first argue that BAB has put forth no evidence that "Aeroflow concealed a plan to use BAB's comprehensive business plan to create and sell a competing product[,]"[121] and second, that even if they had such a plan, the undisputed evidence shows that (i) Aeroflow did not have a duty to disclose its alleged intention to use BAB's business plan; and (ii) Aeroflow's alleged plan was not material to Francisco's decision to disclose BAB's business plan to Aeroflow.[122] Defendants further contend that the Court should grant summary judgment on both

---

[119] In the Court's 4 November 2020 Order and Opinion on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (the "November 2020 Order"), the Court dismissed these two claims except to the extent they were based on the July 19 Call. *See Vitaform, Inc.*, 2020 NCBC LEXIS 132, at *47.

[120] (*See* Defs.' Br. Supp. 22–23.) Here again, Defendants argue without opposition that "BAB now concedes that Aeroflow never promised to sell BAB's garments exclusively." (Defs.' Br. Supp. 23.) The Court therefore dismisses BAB's fraudulent misrepresentation claim to the extent it is based on an alleged promise by Aeroflow to sell BAB's products exclusively.

[121] (Defs.' Br. Supp. 23.)

[122] (*See* Defs.' Br. Supp. 23–25.)

fraud claims because Francisco's reliance on the alleged misrepresentation and omission was not reasonable in the circumstances.[123]

62. In response, BAB argues that its forecast of evidence is sufficient to maintain both fraud claims. First, BAB contends that the record evidence shows that at the time Israel promised confidentiality, Aeroflow never "intended to keep BAB's compilation of information confidential."[124] BAB also contends that "Israel took the affirmative act of promising confidentiality during the July 19 Call, thereby concealing the underlying and pre-existing plan to compete with BAB through Motif[,]" which is further evidenced by Defendants' subsequent conduct.[125] With regard to both fraud claims, BAB contends that whether Francisco reasonably relied on Israel's false representation or omission is a question of fact for the jury.[126]

63. Our appellate courts routinely identify the following five elements to make out a *prima facie* case for fraud: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Cummings*, 2021-NCSC-147, ¶ 53 (quoting *Forbis v. Neal*, 361 N.C. 519, 526–27 (2007)). "[A]ny reliance on the allegedly false representations must be reasonable." *Id.* (quoting *Forbis*, 361 N.C. at 527).

---

[123] (*See* Defs.' Br. Supp. 25–26.)

[124] (Pl.'s Resp. 18.)

[125] (Pl.'s Resp. 21.)

[126] (*See* Pl.'s Resp. 20.)

1.  Fraudulent Misrepresentation

64.     Defendants first contend that any statements made by Israel concerning the confidentiality of BAB's comprehensive business plan were merely promises rather than representations of past or present facts.[127]

65.     North Carolina law is clear that "[a] mere promissory representation will not support an action for fraud.  However, a promissory misrepresentation may constitute actual fraud if the misrepresentation is made with intent to deceive and with no intent to comply with the stated promise or representation." *Hills Mach. Co. v. Pea Creek Mine, LLC*, 265 N.C. App. 408, 419 (2019) (cleaned up).  "Fraud is not automatically presumed by the mere failure, nothing else appearing, to perform an agreement or to carry out a promise." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 169–70 (2009) (cleaned up).

66.     Although Defendants assert that BAB has presented no evidence that "Aeroflow intended to breach the alleged [confidentiality] promise at the time it was supposedly made[,]"[128] BAB contends that the undisputed evidence demonstrates that Aeroflow planned to enter into the post-partum compression garment market prior to the July 19 Call and, thus, never had any intention of ensuring the confidentiality of BAB's business plan.[129]

---

[127] (*See* Defs.' Br. Supp. 22.)

[128] (Defs.' Br. Supp. 23.)

[129] (*See* Pl.'s Resp. 18–19.)

67.    In support of its argument, BAB relies on a series of e-mails authored and received by Aeroflow and Motif employees, including Israel, in the week leading up to the July 19 Call.  On 13 July 2018, Hill sent Israel an e-mail consisting of links to post-partum compression garments available for purchase, including BAB's products, on three different websites, noting in the subject line that "I don't see the [insurance] codes on the websites."[130]  In a series of e-mails dated 16 July 2018, Fonville, a Motif employee,[131] solicited feedback from Aeroflow employees, including Israel, regarding the design of an e-mail marketing template with the generic subject line "Postpartum Recovery Apparel" that consisted of 1NW's product page for BAB's post-partum compression garments.[132]   That same day, Cheri Hoffman ("Hoffman"), brand manager at Aeroflow, forwarded the e-mail marketing template to Jennifer Jordan ("Jordan"), director of "Mother and Baby" at Aeroflow, indicating that she had "lots of questions" and had "already added this to the agenda [of our manager meeting.]"[133] Jordan responded, "I'm sure there's a really good plan in place and they are just getting a jump on everything by getting an email in place[,]" to which Hoffman responded that she "would like to be involved from the beginning on anything that

[130] (Disc. Docs. at AEROFLOW_0000798.)

[131] The Court notes that although Fonville is an employee of Motif, his e-mail address domain is "aeroflowinc.com."  (*See, e.g.*, Disc. Docs. at AEROFLOW_0000779, 81.)

[132] (*See* Disc. Docs. at AEROFLOW_0000779–81, 913–16, MOTIF_0000185–92.)

[133] (Disc. Docs. at AEROFLOW_0002482, 598.)

has [*Aeroflow*] branding[.]"[134]  The morning of the July 19 Call, Hill forwarded an e-mail from Ryan Wright ("Wright"), CEO of 1NW, to Israel in which Wright stated that he was "[l]ooking forward to reviewing the marketing agreement for compression."[135]  Hill responded shortly thereafter that he was "[w]orking on the Marketing Services contract now."[136]

68.    Defendants argue that these e-mails "show only Aeroflow's general interest in selling maternity compression garments, particularly BAB's products; [1NW's] introduction of BAB to Aeroflow; and Defendants' foray into compression socks."[137]  While the evidence may support those inferences, it is equally true that a jury could also reasonably infer from this same evidence that Motif was planning to develop its own post-partum compression products after initially marketing BAB's products.  Furthermore, the pre-call e-mails and Israel's contradictory deposition testimony create an issue of fact as to whether or not Israel knew that Aeroflow was engaged in internal discussions about entering into the maternity compression market prior to the July 19 Call.[138]

---

[134] (Disc. Docs. at AEROFLOW_0002598 (emphasis added).)

[135] (Disc. Docs. at AEROFLOW_0000765.)

[136] (Disc. Docs. at AEROFLOW_0000765, 868.)

[137] (Defs.' Reply 9.)

[138] (*Compare* Israel Dep. 12:5–8 ("Q. So prior to that [July 19 C]all, as a company, prior to that, making that call to [Francisco], you guys had already decided to go into maternity compression, is that right?  A. No."), *with* 16:3–12 ("Q. Were you involved in any discussions about going into maternity compression prior to July 19th, 2018?  A. Yes.  Q. You were involved in discussions?  A. Yes.  Q. And who was involved in those discussions with you?  A. Josh Hill.").)

69.     Taken together, the Court concludes that a jury could find from this evidence that when Israel allegedly promised Francisco to keep BAB's business model confidential during the July 19 Call, Israel was aware that Aeroflow had a plan to compete with its own product line and therefore made that promise "with intent to deceive and with no intent to comply[.]" *Hills Mach. Co.*, 265 N.C. App. at 419.

70.     Even so, Defendants contend that BAB's fraudulent misrepresentation claim nevertheless fails because Francisco's reliance on Israel's alleged misrepresentation was unreasonable as a matter of law.[139]

71.     "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Forbis*, 361 N.C. at 527. But "[w]here reliance ceases to be reasonable and becomes such negligence and inattention that it will, as a matter of law, bar recovery for fraud is frequently very difficult to determine." *Tillery Env't LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at *20 (N.C. Super. Ct. Feb. 9, 2018) (quoting *Johnson v. Owens*, 263 N.C. 754, 758 (1965)).

72.     In the circumstances presented here, the Court concludes that Defendants' arguments about the reasonableness of Francisco's reliance on Israel's alleged promise of confidentiality are properly tested by a jury. *See, e.g.*, *Massey v. Duke Univ.*, 130 N.C. App. 461, 466 (1998) ("It is only in exceptional cases that the issue of reasonable reliance on an alleged misrepresentation may be decided by summary judgment.").

---

[139] (*See* Defs.' Br. Supp. 25–26; Defs.' Reply 8.)

73.     The Court will therefore deny Defendants' Motion as to BAB's fraudulent misrepresentation claim premised on Aeroflow's alleged promise of confidentiality made during the July 19 Call.

         2.     Fraudulent Concealment

74.     Defendants make four arguments for dismissal of BAB's fraudulent concealment claim: (i) BAB has put forth no evidence that "Aeroflow concealed a plan to use BAB's comprehensive business plan to create and sell a competing product[;]" (ii) even if there was such a plan, Aeroflow did not have a duty to disclose it to BAB; (iii) any alleged plan was not material to Francisco's decision to provide Aeroflow with BAB's information; and (iv) Francisco's reliance on the alleged omission was not reasonable.[140]

75.     The Court has already determined that Defendants' first argument is without merit in its discussion of BAB's fraudulent misrepresentation claim above.

76.     "[I]t is well settled that where there is a duty to speak[,] the concealment of a material fact is equivalent to fraudulent misrepresentation." *Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 198 (1976). "Generally, commercial parties engaging in an arms-length transaction with one another do not have a duty to disclose." *Aym Techs., LLC v. Scopia Cap. Mgmt. LP* (*Aym Techs. II*), 2021 NCBC LEXIS 29, at *23 (N.C. Super. Ct. Mar. 31, 2021) (collecting cases). Our courts have determined that a duty to disclose arises where:

         (1) a fiduciary relationship exists between the parties to the transaction;
         (2) there is no fiduciary relationship and a party has taken affirmative

---

[140] (Defs.' Br. Supp. 23–26.)

steps to conceal material facts from the other; [or]141 (3) there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.

*Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009) (cleaned up). "A concealed fact is considered material when it would have influenced the decision or judgment of another party, if known." *Tillery Env't LLC*, 2018 NCBC LEXIS 13, at *22 (citing *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75–76 (2004)).

77. The Court has already concluded that Aeroflow and BAB were not in a fiduciary relationship. *See Vitaform, Inc.*, 2020 NCBC LEXIS 132, at *14–15. With regard to the second scenario, Defendants first argue that BAB has failed to present evidence that Aeroflow took any affirmative steps to conceal an alleged plan to sell its own competing product.142 "[T]o show a duty to disclose based on affirmative steps to conceal a material fact, a plaintiff must allege the specific affirmative acts taken to conceal that fact." *Aym Techs. II*, 2021 NCBC LEXIS 29, at *25 (citation omitted). BAB contends that the alleged promise of confidentiality itself constituted an

---

141 Although *Hardin* connected the second and third scenarios with the conjunctive word "and," *Hardin* examined the "third circumstance" alone, making it clear that the three scenarios are independent and that the presence of any one of the three triggers a duty to disclose. *See Hardin*, 199 N.C. App. at 696–97. The Court has therefore replaced "and" with the disjunctive "or" above to better reflect *Hardin's* meaning. Numerous decisions of this Court have done likewise. *See, e.g.*, *Lee v. McDowell*, 2022 NCBC LEXIS 51, at *45 (N.C. Super. Ct. May 26, 2022); *Higgins v. Synergy Coverage Sols., LLC*, 2020 NCBC LEXIS 6, at *35 (N.C. Super. Ct. Jan. 15, 2020); *Shaw v. Gee*, 2016 NCBC LEXIS 103, at *11 (N.C. Super. Ct. Dec. 21, 2016).

142 (*See* Defs.' Br. Supp. 25.)

affirmative act of concealment by Aeroflow and that Defendants engaged in other acts to further the alleged plan after the July 19 Call.[143]

78. Defendants disagree, arguing that the alleged promise "is part of the fraud claim, not the additional 'affirmative act' that creates a duty to disclose."[144] Defendants additionally contend that "[a] DME distributor could very well both 'promise confidentiality' and concurrently plan to sell a competitor's garments[ ]" without committing an affirmative act to conceal a plan to compete.[145] Furthermore, Defendants argue that subsequent acts have no bearing on whether Aeroflow concealed a material fact during the July 19 Call.[146]

79. Here again, BAB has the better argument. BAB's fraudulent concealment claim is premised on Aeroflow's alleged concealment of a "plan *to use BAB's comprehensive business plan* to create and sell a competing product[,]" rather than mere concealment of a plan to compete.[147] As such, Israel's alleged promise "not to disclose BAB's specialized plans . . . to BAB's competitors and/or potential competitors[ ]"[148] can be viewed as an affirmative act taken by Aeroflow to conceal its alleged intent to use BAB's business model for its own competitive advantage.

---

[143] (*See* Pl.'s Resp. 21.)

[144] (Defs.' Reply 11.)

[145] (Defs.' Reply 11.)

[146] (*See* Defs.' Reply 12.)

[147] (Defs.' Br. Supp. 23 (emphasis added); *see also* FAC ¶¶ 113–16.)

[148] (FAC ¶ 118.)

80.     Moreover, a jury could infer that other evidence in the record, when viewed in the light most favorable to BAB, constitutes affirmative steps by Defendants to conceal a plan to use BAB's information to design and sell a competing product. The Court has already concluded above that a jury could reasonably conclude that the e-mails exchanged among Aeroflow and Motif employees in the week leading up to the July 19 Call evidenced a plan by Defendants to launch their own line of maternity compression garments. In addition, the record contains several actions taken by Defendants shortly after the July 19 Call and unbeknownst to BAB from which an intent to conceal may also be inferred.[149] These acts include: (1) Defendants' confirmation that the Maternity Compression Garments were not protected by patent;[150] (2) Defendants' identification of BAB's Chinese manufacturing facility;[151] (3) Defendants' invitation to Francisco to train their staff on BAB's products despite an internal assertion that the relationship would not "last long before bringing this

---

[149] Despite Defendants' assertion that acts alleged to have occurred after the July 19 Call "do not constitute evidence that there was even a plan in place to disclose" at the time of the July 19 Call, our courts regularly consider subsequent acts as evidence of an intent to conceal. *See, e.g.*, *Jones v. Harrelson & Smith Contrs., LLC*, 194 N.C. App. 203, 214–15 (N.C. App. 2008) (relying on subsequent actions as further evidence of initial concealment of a material fact), *aff'd per curiam*, 363 N.C. 371 (2009); *Meekins v. Box*, 152 N.C. App. 379, 388 (N.C. App. 2002) (considering subsequent actions of the defendant as constituting a "continued pattern of deceit"); *Potts v. KEL, LLC*, 2021 NCBC LEXIS 100, at *22 (N.C. Super. Ct. Nov. 5, 2021) ("Circumstantial evidence of intent may include, among other things, a motive to deceive, close proximity between the promise and the breach, efforts to conceal nonperformance from the promisee, and a broader pattern of deceit.").

[150] (*See* Disc. Docs. at AEROFLOW_0000609, MOTIF_0000551.)

[151] (*See* Disc. Docs. at AEROFLOW_0000609.)

in house";[152] and (4) Fonville's purchase of BAB's products from Amazon "to get [them] knocked off[.]"[153] Taken together, the Court concludes that, when viewed in the light most favorable to BAB, a jury could conclude that Defendants' pre- and post-July 19 Call actions constitute "specific affirmative acts taken to conceal" an alleged plan to use BAB's business model to launch a competing product.

81.     The Court also concludes that BAB has put forth sufficient evidence to show that the concealed information was material to Francisco's agreement to disclose BAB's information.  Defendants rely on Francisco's concession that Aeroflow "did not represent" that it would purchase post-partum compression garments exclusively from BAB[154] to contend that, because the "lack of exclusivity was not material to BAB's decision-making," it is reasonable to infer that "a plan for Motif to develop its own line of garments would not have been material either."[155]  But Aeroflow's reliance on Francisco's concession is misplaced.  Under Israel's alleged promise, Aeroflow could market compression garments sold by other companies—as Defendants have repeatedly emphasized—but any information provided by BAB could be used to market BAB products *only*.[156]  And BAB's acknowledgment that Aeroflow needed this

[152] (Disc. Docs. at AEROFLOW_0000591.)

[153] (*See* Fonville Aff. ¶ 6; Disc. Docs. at AEROFLOW_0000588–90, MOTIF_0000167; *see also* Disc. Docs. at MOTIF_0000551 (suggesting Defendants "try to Frankenstein" BAB's products).)

[154] (Francisco Dep. 216:22–17:1.)

[155] (Defs.' Br. Supp. 24.)

[156] (*See* Francisco Dep. 217:21–18:9; 6th Francisco Aff. ¶ 12; 3d Francisco Aff. ¶¶ 23–26.)

information to effectively sell BAB's products does not contradict Francisco's assertion that, had he known that Aeroflow was poised to become a competitor, he would not have decided to "reveal[ ] anything about [BAB's] process and products" to Aeroflow.[157]   BAB has therefore provided sufficient evidence that knowledge of Aeroflow's alleged plan to sell its own competing product was a material fact that would have influenced BAB's decision to provide the components of its business model to Aeroflow.[158]

82.   As for Defendants' last argument—the reasonableness of BAB's reliance on the alleged omission—the Court concludes that the facts are not so clear that they support only one conclusion, *see Forbis*, 361 N.C. at 527, and thus that this issue is properly within the purview of the jury, *see Massey*, 130 N.C. App. at 466.

83.   The Court therefore concludes that the record, viewed in the light most favorable to BAB, creates an issue of fact as to whether Defendants fraudulently concealed a plan to use BAB's comprehensive business model to design and market a

---

[157] (6th Francisco Aff. ¶ 16; *see also* Francisco Dep. 170:14–18 ("Had I known that they were developing Motif . . . [p]roducts at the time we commenced business which overlapped, . . . there's no way I would have provided this to a competitor[.]"); 3d Francisco Aff. ¶ 30 ("BAB was induced by Aeroflow's strategy session.").)  Although Defendants argued that Francisco's 6th affidavit was "self-serving" and "contradicted by other undisputed facts in this case[,]" (Defs.' Reply 12; *see also* Tr. 16:4–17:22), the Court concludes that the affidavit does not contradict his prior testimony on this point. *See Kixsports, LLC*, 2021 NCBC LEXIS 32, at *31 ("A non-moving party cannot create an issue of fact to defeat summary judgment simply by filing an affidavit contradicting his prior sworn testimony." (quotation and citation omitted)).

[158] Because the Court has determined that Defendants had a duty to disclose under the second scenario, *see Hardin*, 199 N.C. App. at 696, the Court will not address the parties' arguments as they relate to the third scenario.

competing product. The Court will therefore deny Defendants' Motion with respect to this claim.

D.     Unfair Competition Claims

84.     BAB has asserted two claims based on Defendants' alleged unfair competition. First, BAB alleges a claim for common law unfair competition and violations of the UDTPA and the federal Lanham Act based on Defendants' alleged sale of BAB's products as if they were Defendants' own (the "Reverse Passing Off Claims"). Next, BAB alleges a claim for common law unfair competition and violations of the UDTPA against Defendants for allegedly fraudulently and deceptively inducing BAB to share its confidential business plan and thereby facilitate Defendants' design and sale of their competing product (the "Unfairness Claims").[159] Defendants seek dismissal of both sets of claims.

1.     BAB's Reverse Passing Off Claims

a.     *The Lanham Act Claim*

85.     The federal Lanham Act provides, in relevant part, as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

---

[159] In the November 2020 Order, the Court dismissed these claims except to the extent described above. *See Vitaform, Inc.*, 2020 NCBC LEXIS 132, at *37–38, *46–47.

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

86. "Passing off" under the Lanham Act "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003). "Reverse passing off" occurs when "[t]he producer misrepresents someone else's goods or services as his own." *Id.* Both actions violate the Lanham Act. *See* 15 U.S.C. § 1125(a)(1).

87. A reverse passing off claim under the Lanham Act requires a plaintiff to prove:

(1) that the work at issue originated with [the plaintiff]; (2) that origin of the work was falsely designated by [a defendant]; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that [the plaintiff was] harmed [or likely to be harmed] by [a defendant's] false designation of origin.

*Bon Aqua Int'l, Inc. v. Second Earth, Inc.*, No. 1:10CV169, 2013 U.S. Dist. LEXIS 11635, at *57 (M.D.N.C. Jan. 29, 2013) (citation omitted), *report and recomm. adopted by* 2013 U.S. Dist. LEXIS 203623 (M.D.N.C. Feb. 26, 2013). Defendants argue that BAB's Reverse Passing Off claim fails because Aeroflow never falsely designated the origin of BAB's products and because there was no likelihood of consumer confusion.

(1) False Designation of Origin

88. BAB argues that, beginning in March 2019 (when Aeroflow stopped ordering BAB products), "Aeroflow used all BAB marketing content, product features and

benefits, models, sizing charts, etc[.]" to market both BAB's and Motif's garments, "yet never identified BAB as the brand and at some point identified [Motif] as the brand."[160] Defendants do not dispute that they used certain of BAB's marketing materials to market both BAB's and Motif's products,[161] but offer evidence that "Aeroflow treated its inventory of maternity compression garments as 'brand agnostic.' "[162] Aeroflow argues that the undisputed evidence shows that it did not represent to customers that the customer would receive a specific brand of post-partum compression garment; rather, when a customer placed an order, Aeroflow sent the customer either a BAB garment, properly packaged and labeled as a BAB product, or a Motif garment, properly packaged and labeled as a Motif product.[163] Based on this undisputed evidence, Defendants argue that BAB has failed to show that Aeroflow ever falsely designated BAB's products as Motif's, requiring the dismissal of BAB's claim under the Lanham Act.[164]

89. The Court agrees. Under the Lanham Act, "an entity makes a false designation of origin sufficient to support a reverse passing off claim only where it falsely represents the product's geographic origin or represents that it has manufactured the tangible product that is sold in the marketplace when it did not in

[160] (Pl.'s Resp. 24.)

[161] (*See* Status Report, ECF No. 38.)

[162] (Defs.' Br. Supp. 28; *see* Jordan Dep. 74:3–17.)

[163] (Defs.' Br. Supp. 28.)

[164] (*See* Defs.' Br. Supp. 28.)

fact do so." *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 587 (6th Cir. 2015) (cleaned up). BAB claims it has offered evidence sufficient to maintain its claim and points to Francisco's affidavit testimony as its support. According to Francisco, by March 2019, (i) the product images supplied by BAB and used by Defendants to sell BAB products on their websites no longer included BAB's brand labels; (ii) Defendants then added new images that portrayed models wearing BAB's products with no brand labels; and (iii) the products were later marketed under the Motif brand label.[165]

90.    The record, however, does not support Francisco's assertions. First, although Francisco attests in boilerplate fashion that the entirety of his affidavit testimony is "within [his] personal knowledge," he nowhere identifies the source for his knowledge concerning the product images and branding that he asserts appeared on Defendants' websites. To the contrary, he testifies that he "discovered" this information, and he does not specifically aver that he actually saw the images and branding he purports to describe. Rule 56(e), however, requires that affidavits supporting or opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The Court therefore concludes that Francisco's Fifth Affidavit at paragraphs 106–108 fails on each of these requirements and thus that the testimony reflected in these paragraphs is not properly considered on this Motion.

---

[165] (*See* 5th Francisco Aff. ¶¶ 106–08.)

91. Nonetheless, even if the Court were to consider this testimony, and, in particular, Francisco's testimony that "[b]y March 6, 2019, . . . my products were being marketed under the name 'Motif Medical[,]' "[166] which is BAB's critical factual assertion for its Reverse Passing Off claim, the Court notes that in the same affidavit, Francisco directly contradicted this testimony, admitting, as Defendants contend, that "Aeroflow sold a nameless brand."[167]

92. The documentary evidence on which BAB relies likewise shows that Defendants sold BAB and Motif products in a "brand agnostic" manner. For example, BAB relies on screenshots of a 2 April 2019 press release from PRWeb announcing Aeroflow's addition of a "*selection* of Maternity Support Bands,"[168] as well as screenshots of an overview of the benefits of maternity compression garments on Aeroflow's website dated 23 December 2018 and several undated screenshots of Aeroflow's product pages for the various compression garments it sold.[169]

93. Despite Francisco's assertion that, at some point, BAB's products "were being marketed under the name 'Motif Medical[ ]' " and that the "models shown wore products with the Motif brand name on them[,]"[170] none of the product images include

[166] (5th Francisco Aff. ¶ 106.)

[167] (5th Francisco Aff. ¶ 39; *see also* 3d Francisco Aff. ¶ 12 ("Aeroflow, when it was carrying my product, always referred to the individual products as a number, never identifying the source.").)

[168] (Pl.'s Resp. Ex. S at VF004794–95 (emphasis added).)

[169] (*See* Pl.'s Resp. Ex. S at VF004797–800, 803–04.)

[170] (5th Francisco Aff. ¶¶ 106, 08.) The Court further notes that, according to Francisco, Aeroflow "made almost imperceptible cosmetic changes to the products[,]" (5th Francisco Aff.

brand labels, and the only mention of a specific brand name appears on the product page for the "Postpartum Compression Garment" underneath the "Description" label, where it states that "Motif Postpartum Recovery Support Garments were designed by medical professionals"[171] without suggesting which brand a customer would receive upon purchase. In fact, the only evidence in the record that reflects Aeroflow's representations to its customers about which brand of compression garment a customer would receive upon purchase supports Defendants' position: "The brand you will receive is either [BAB] or [Motif]."[172] Moreover, BAB has proffered no evidence that a customer ever received a BAB product in a Motif package and, as counsel for BAB acknowledged at the Hearing, when BAB itself purchased a Motif product, BAB received a Motif garment in a Motif package.[173]

94.     "[T]he Lanham Act protects the ability to control one's brand; it does not protect the ability to control one's inventions or innovations." *Kehoe Component Sales Inc.*, 796 F.3d at 586–87. Taking the evidence in the light most favorable to BAB, the Court concludes that Aeroflow did not "falsely represent[ ] the product's geographic

---

¶ 114), and that "[i]f you strip the labels off, you . . . would not be able to determine whose was whose[,]" (Francisco Dep. 166:18–22).

[171] (Pl.'s Resp. Ex. S at VF004804.)

[172] (Pl.'s Resp. Ex. S at VF004802; *see also* Disc. Docs. at AEROFLOW_0000980–82, 1005–06 (discussing how to refine Aeroflow's "compression dashboard"—a computer program that "determine[s] what products are interchangeable" and automatically selects the product with highest inventory—because BAB's products were populating when other product brands were selected).)

[173] (*See* Tr. 48:18–24; *see also* Pl.'s Resp. Ex. A, ECF No. 126.2 (visual product comparison).)

origin or represent[ ] that it ha[d] manufactured the tangible product that is sold in the marketplace when it did not in fact do so." *Id.* at 587.

### (2) Likelihood of Consumer Confusion

95. Defendants also contend that BAB's Reverse Passing Off claim under the Lanham Act fails because BAB has not shown a likelihood of customer confusion.[174]

96. Courts have articulated that the following factors are relevant to the "likelihood of confusion" inquiry under the Lanham Act:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012) (citation omitted). However, "[t]hese factors are not always weighted equally, and not all factors are relevant in every case." *Id.* at 154 (quoting *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259–60 (4th Cir. 2007)).

97. BAB has failed to offer evidence from which a jury could conclude that Aeroflow's marketing caused consumer confusion. As discussed above, the undisputed evidence shows that Aeroflow did not market a particular brand of maternity compression garments.[175] When asked which brand Aeroflow sold, the evidence shows that Aeroflow responded that customers would receive either a BAB

---

[174] (*See* Defs.' Br. Supp. 29.)

[175] (Defs.' Br. Supp. 28; *see* Pl.'s Resp. Ex. S at VF004797–800, 02–04.)

product or a Motif product.[176]   Moreover, the branding on the products and their packaging is distinct, there are no allegations of mislabeling,[177] and BAB has not offered evidence suggesting that customers ever received BAB products in Motif packaging or Motif products in BAB packaging.   Accordingly, because BAB has not offered evidence of customer confusion, BAB's Reverse Passing Off claim under the Lanham Act must also fail for this separate reason.

b.   *Violation of the UDTPA and Common Law Unfair Competition*

98.   To sustain a claim for unfair and deceptive trade practices under the UDTPA, a plaintiff must allege: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiff[ ]." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71–72 (2007) (quoting *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000)).   " 'A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and a 'practice is deceptive if it has the capacity or tendency to deceive.' " *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91 (2013) (quoting *Walker*, 362 N.C. at 72).   North Carolina courts have held that "[t]he 'passing off' of one's goods as those of a competitor has long been regarded as unfair competition." *Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C. App. 393, 404 (1978).   Our courts have also determined that "the underlying nature of the wrong" in passing off a competitor's goods as one's own is the same because

---

[176] (Pl.'s Resp. Ex. S at VF004802.)

[177] (*See* Defs.' Br. Supp. 29; Tr. 48:10–24; Pl.'s Resp. Ex. Q at VF004808–10, 30, 39–40, ECF No. 126.19.)

both passing off and reverse passing off "involve the misappropriation of benefits which flow from the quality of a competitor's product." *Id.* at 405.

99. The tort of common law unfair competition is similar and "consist[s] of acts or practices by a competitor which are likely to deceive the consuming public." *Stearns v. Genrad, Inc.*, 564 F. Supp. 1309, 1320 (M.D.N.C. 1983). "The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." *Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749 (1997). Common law unfair competition includes activity "such as trademark or trade name infringement, imitation of a competitor's product or its appearance, interference with a competitor's contractual relations, disparagement of a competitor's product or business methods, and misappropriation of a competitor's intangible property rights such as advertising devices or business systems." *Stearns*, 564 F. Supp. at 1320.

100. Significantly for present purposes, "[c]ourts recognize that a claim for common law unfair competition is analyzed the same way as a claim for unfair or deceptive trade practices under [the UDTPA]." *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 159, at *33 (N.C. Super. Ct. Nov. 29, 2018); *see also Blue Rhino Glob. Sourcing, Inc. v. Well Traveled Imps., Inc.*, 888 F. Supp. 2d 718, 721 n.1 (M.D.N.C. 2012) ("[T]he standard which a plaintiff must meet to recover [on an unfair competition claim under North Carolina common law] is not appreciably different from a claim under the North Carolina [UDTPA]." (cleaned up)).

101. As discussed above, the undisputed evidence here shows that (i) Aeroflow did not represent that customers would receive a specific brand of product upon purchase; and (ii) the products customers received were appropriately branded and packaged in corresponding branded packaging. Since BAB has failed to offer evidence that Aeroflow engaged in unfair or deceptive practices in selling Motif's and BAB's products, the Court will dismiss BAB's Reverse Passing Off Claims based on the UDTPA and common law unfair competition.

2. BAB's Unfairness Claims

102. The alleged misconduct on which BAB's Unfairness Claims rest is the same conduct on which BAB's fraud claims are premised. Having concluded that Defendants' Motion should be denied with respect to BAB's fraudulent concealment claim and granted with respect to BAB's fraudulent misrepresentation claim except to the extent that claim is based on an alleged promise made by Aeroflow during the July 19 Call to maintain the confidentiality of BAB's comprehensive business plan, the Court concludes that BAB's Unfairness Claims should be resolved to the same extent and in the same manner.

E. Unjust Enrichment

103. BAB contends that it is entitled to recover on its claim for unjust enrichment because it conferred on Defendants the benefit of its comprehensive business plan to break into an emerging market.[178]

---

[178] (*See* Pl.'s Resp. 25.)

104. "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Krawiec*, 370 N.C. at 615 (quoting *Atl. Coast Line R.R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96 (1966)). To establish a claim for unjust enrichment, "a party must prove that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002). In addition, the benefit conferred must be measurable. *See Krawiec*, 370 N.C. at 615.

105. Defendants argue that BAB did not confer a benefit on Aeroflow because the materials BAB provided to Aeroflow were "part and parcel of the parties' contractual relationship" and "*essential* for Aeroflow to market, distribute, and seek insurance reimbursement for BAB's products."[179] *See Se. Shelter Corp.*, 154 N.C. App. at 331 ("If there is a contract between the parties, the contract governs the claim and the law will not imply a contract."); *see also Atl. Coast Line R.R. Co.*, 268 N.C. at 96 ("The rule [of unjust enrichment] does not apply when the services are rendered . . . in discharge of some obligation." (emphasis omitted)). This argument is without merit, however, because BAB has not alleged a breach of contract claim and the Court, in dismissing BAB's breach of good faith and fair dealing claim, did not determine whether BAB and Aeroflow entered into an enforceable oral contract. In addition,

---

[179] (Defs.' Br. Supp. 27.)

BAB has put forth sufficient evidence alleging that Defendants engaged in "wrongful" conduct to sustain its claim, as the Court has determined that a limited portion of BAB's fraud claims survives summary judgment. As a result, Defendants' Motion is denied with respect to this claim.

F.      Punitive Damages and Attorneys' Fees

106. BAB seeks punitive damages based on its fraud claims and reasonable attorneys' fees based on its UDTPA claims.[180]   Because the Court has denied summary judgment on BAB's fraud claims and its unfairness-based UDTPA claim, however, the Court will likewise deny Defendants' Motion with respect to these requests for relief.

IV.

CONCLUSION

107. **WHEREFORE**, the Court, for the reasons set forth above, hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

   a. The Court **GRANTS** the Motion as to BAB's claims for misappropriation of trade secrets and breach of the duty of good faith and fair dealing, and those claims are hereby **DISMISSED with prejudice**.

   b. The Court **GRANTS** the Motion as to BAB's claims for common law unfair competition and violations of the UDTPA and the federal Lanham Act based on BAB's allegations that Defendants sold BAB's products as if they

---

[180] (*See* Pl.'s Resp. 25–26.)

were Defendants' own (the Reverse Passing Off Claims), and those claims are hereby **DISMISSED with prejudice**.

c.  The Court **GRANTS** the Motion as to BAB's claim for fraudulent misrepresentation and that claim is **DISMISSED with prejudice**, except to the extent BAB's fraud claim is based on an alleged promise made by Aeroflow during the July 19 Call to maintain the confidentiality of BAB's comprehensive business plan, and to that extent, the Court **DENIES** the Motion and this aspect of BAB's claim shall proceed to trial.

d.  The Court **DENIES** the Motion as to BAB's claim for fraudulent concealment based on BAB's allegations in connection with and arising from the July 19 Call, and that claim shall proceed to trial.

e.  The Court **GRANTS** the Motion as to BAB's claims for common law unfair competition and violations of the UDTPA (the Unfairness Claims) and those claims are **DISMISSED with prejudice**, except to the extent those claims are based on Aeroflow's alleged promise during the July 19 Call to maintain the confidentiality of BAB's comprehensive business plan and Aeroflow's alleged fraudulent concealment in connection with and arising from the July 19 Call, and to that extent, the Court **DENIES** the Motion and those aspects of these claims shall proceed to trial.

f.  The Court **DENIES** the Motion as to BAB's claim for unjust enrichment, and that claim shall proceed to trial.

g. The Court **DENIES** the Motion as to BAB's request for punitive damages and for attorneys' fees under its unfairness-based UDTPA claim.[181]

**SO ORDERED**, this the 27th day of October, 2022.

 /s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

[181] The Court notes that Defendants' counterclaim for defamation per se will also proceed to trial. (*See* Countercls. ¶¶ 49–55; Notice Partial Dismissal.)